IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **SHIN DA ENTERPRISES INC., et al.,** | : | **CIVIL ACTION** |
| *Plaintiffs,* | : | |
| | : | |
| v. | : | |
| | : | |
| **WEI XIANG YONG, et al.,** | : | |
| *Defendants.* | : | No. 21-cv-03384 |

<u>MEMORANDUM</u>

**KENNEY, J.**                                                                                                           **DECEMBER 19, 2023**

## I.   INTRODUCTION

In this civil Racketeer Influenced and Corruption Organizations Act ("RICO") action, Plaintiffs alleged that Defendants orchestrated a years-long fraudulent scheme that involved submitting false invoices on construction projects in order to bilk money from banks, the federal government, and subcontractors. After a seven-day jury trial, the jury found all Defendants liable on one count of a substantive RICO claim, 18 U.S.C. § 1962(c); and one count of RICO conspiracy, § 18 U.S.C. § 1962(d); for a total liability of $1,710,160.80, which was trebled to a figure of $5,130,482.40 pursuant to 18 U.S.C. § 1964(c).

There were two sets of Defendants in this matter. The "Wei Defendants" consisted of John Wei aka Wei Xiang Yong, his wife Jian Mei He aka Mika He, and the companies they personally controlled (UIG Construction, LLC ("UIG"); PA Ridge Associates ("PA Ridge"); Wei's Properties, Inc. ("Wei's Properties'); and Redevelopment Consultants, LLC ("Redevelopment Consultants")). The "Gai Defendants" consisted of Ying Nan Gai and his company, G&Y Contractors, Inc ("G&Y"). The jury found that the Gai Defendants committed at least two acts of bank fraud, wire fraud, and theft by unlawful taking.

1

At trial, Plaintiffs and the Gai Defendants made oral motions for judgment as a matter of law pursuant to Fed. R. Civ. P. 50(a), both of which were denied. Following the entry of judgment, the Gai Defendants filed a renewed motion for judgment as a matter of law (Fed. R. Civ. P. 50(b)) or in the alternative, a motion for a new trial. Fed. R. Civ. P. 59. This filing contends that Plaintiffs did not submit sufficient evidence at trial to find the Gai Defendants liable on either RICO count. In particular, the Gai Defendants allege that 1) there was no evidence that Mr. Gai had committed more than one predicate act, 2) Mr. Gai lacked the specific intent to defraud required for wire fraud or bank fraud, 3) Mr. Gai did not commit any alleged acts as part of a broader scheme, and 4) Mr. Gai was not alleged to be involved in the scheme for sufficient time to support a finding of continuity.

Mr. Gai comes to this conclusion by ignoring much of the evidence that was adduced at trial. The jury had ample evidence to conclude that Mr. Gai was liable on both RICO counts. Mr. Gai's motions are **DENIED.**

## II. PROCEDURAL AND FACTUAL BACKGROUND

At trial, Plaintiffs presented evidence of a long-running scheme to defraud individuals and financial institutions. Defendant John Wei is a real estate developer who was working on a project to purchase and redevelop 525 North 11th Street in Philadelphia (the "525 Project"). ECF No. 205 at 63. Mr. Wei was the controlling owner of PA Ridge, a real estate development company that purchased the 525 Project. *Id.* Mr. Wei is also the controlling owner of UIG, the general contractor of the 525 Project. *Id.* at 64. Mr. Wei is also the controlling owner of Wei's Properties, a subcontractor hired by UIG to perform some work on the 525 Project. *Id.* Mr. Wei hired Redevelopment Consultants, a company owned by his wife with no employees, to perform consulting work for the 525 Project. ECF No. 204 at 142, 157. Finally, Mr. Wei hired Ying Nan

Gai and his company, G&Y) to do additional subcontracting work at the 525 Project. ECF No. 206 at 107-08.

Mr. Wei obtained an $18 million construction loan for the 525 Project from Parke Bank. ECF No. 204 at 8. Every few weeks, PA Ridge would submit a list of work done during those weeks with invoices from the contractors who did the work. *Id.* at 8-10. Once the bank received that list, it would send inspectors who would attest that the purported work had been completed, and approve the funds to be released. *Id.* Plaintiffs presented evidence that Mr. Wei used this web of companies that he or his wife controlled to inflate the amounts of money to be obtained from the bank without performing any additional work. For example, PA Ridge hired UIG to do demolition work for $230,000. *Id.* at 175-180. UIG then contracted with Redevelopment Consultants to do the demolition work for $320,000, even though Redevelopment Consultants had no employees and was not licensed to perform this work. *Id.* Redevelopment Consultants then contracted with yet another company (not owned by John Wei or his wife) to actually perform the demolition work for $230,000. *Id.* 175-180.

In the course of their work on the 525 Project, UIG hired Plaintiff Shin Da Enterprises, Inc. ("Shin Da"), a company owned by Lijian Ren, in August 2018 to install cabinets and countertops in the building. ECF No. 203 at 11. The contract included a $20,000 deposit, which Mr. Wei paid to Mr. Ren shortly after signing the contract. *Id.* at 14. Mr. Ren continued performing the installation work, incurring fees of $110,000 according to the contract. *Id.* at 16. However, Mr. Wei refused to pay him the remaining $110,000. *Id.* Mr. Wei claimed he did not have enough cash on hand, so he proposed selling Mr. Ren a building at 446 North 6th Street, that he claimed to own, at a $110,000 discount. *Id.* at 15-16. Mr. Ren agreed, and the parties signed a contract to sell 6th Street property for $2.5 million. *Id.* at 23. The contract required a $50,000 deposit, which Mr. Ren

paid. *Id.* at 28. Despite Mr. Wei's representations that he would sell the 6th Street property to Mr. Ren, the building was actually owned by Mr. Wei's brother, and Mr. Wei did not have the right to sell it. ECF No. 205. Further, Mr. Wei had included in the sale documents a finder's fee agreement (which the parties had not discussed previously) obligating Mr. Ren to pay Mr. Wei an additional $700,000 for the service of finding the 6th Street property to sell, which included an immediate $200,000 deposit on the fee.[1] ECF No. 203 at 43-45. Mr. Ren then paid Mr. Wei an additional $40,000 in cash, and the parties agreed that the $110,000 owed by Mr. Wei on the countertop and cabinet subcontract would be credited towards the $200,000 deposit. *Id.* at 90. Due to the finder's fee, the parties did not close on the sale of the 6th Street property. *Id.* at 48.

After the sale of the 6th Street property fell through, Mr. Wei kicked Mr. Ren and Shin Da off the job site, in January 2019. *Id.* at 50-51. Mr. Ren tried to return to obtain his tools from the job site, which were worth thousands of dollars. *Id.* However, he testified that Mr. Gai refused to allow him entrance to the job site, and threatened to beat him with a metal pipe if he tried to enter. Mr. Ren also testified that some of his cabinets and countertops were also left at the worksite uninstalled, and he was unable to retrieve them. *Id.* at 52; *see also* ECF No. 205 at 97-98.

In March 2019, Mr. Wei retained a firm to inspect the cabinet and countertop work, and found that it was deficient. ECF No. 205 at 94. Mr. Wei then hired Mr. Gai and G&Y to repair Shin Da's ostensibly deficient work. ECF No. 206 at 12-13. Mr. Wei also hired a company called LN Flooring to fix the work. *Id.* Mr. Gai testified at trial that he had been performing subcontracting work at the 525 Project since 2017 before being engaged to fix the cabinets and countertops. *Id.* at 81. Mr. Gai testified that in the normal course of business, Mr. Wei would pay him a certain amount of money, and then only afterward would Mr. Gai provide an invoice,

---

[1] The Court found the finder's fee agreement to be illegal since Mr. Wei was not a licensed broker. *See* ECF No. 197.

4

backfilled with a generic, not necessarily accurate, description and with whatever amount of money Mr. Wei had paid him as the total. *Id.* at 97-98.

As an additional component of his scheme, Mr. Wei found that the 525 Project was eligible for receiving historic tax credits from the federal government. ECF No. 204 at 162. Upon learning this information, he requested a construction loan for an additional $7 million. *Id.* Mr. Wei also submitted an additional 11 invoices for work worth $1.6 million to the government for purposes of inflating the price for historic tax credits, but did not submit those same 11 invoices to Parke Bank. ECF No. 207 at 68-69. Mr. Wei was then able to use complex financial maneuvers to essentially sell the value of the historic tax credits for a total of $5.6 million. ECF No. 205 at 109. The 11 invoices that were not submitted to Parke Bank garnered Mr. Wei an additional $300,000. ECF No. 207 at 68-69

In 2021, Mr. Ren initiated this litigation against the Defendants.[2] After extensive discovery and motion practice, the Court held a seven-day jury trial at which the parties examined nearly a dozen witnesses and reviewed dozens of exhibits. The jury found all Defendants liable on both counts. ECF No. 199. As to Mr. Gai on the substantive count, they found that he was employed by or associated with the enterprise, participated in the conduct of the enterprise's affairs, and committed a pattern of two or more predicate acts of bank fraud, wire fraud, and theft by unlawful taking. *Id.* On the conspiracy count, the jury found that Mr. Gai was part of the agreement to conduct the enterprise's affairs, and either agreed to the overall objective of the conspiracy or agreed to commit two predicate acts as part of the conspiracy. *Id.* The jury found all Defendants liable on both counts in the amount of $1,710,160.80, which was trebled pursuant to the relevant statute to a figure of $5,130,482.40. ECF No. 200.

---

[2] At the time of the trial, there were three ongoing lawsuits in state court between the parties related to the same set of facts. *See* ECF No. 203 at 94-95.

5

### III. STANDARD OF REVIEW

A motion under Rule 50 can be granted where "a reasonable jury would not have a legally sufficient evidentiary basis to find for the party." Fed. R. Civ. P. 50(a)(1). Upon reviewing such a motion, "the court does not weigh the evidence, but draws all factual inferences in favor of the nonmoving party." *Paramount Financial Communications, Inc. v. Broadridge Investor Communications Solutions Inc.*, 2023 WL 4755109 (E.D. Pa. July 26, 2023) (quoting *Lytle v. Household Mfg., Inc.,* 494 U.S. 554 (1990)). "Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge," so the Court "must disregard all evidence favorable to the moving party that the jury is not required to believe." *Reeves v. Sanderson Plumbing Prods., Inc.,* 530 U.S. 133, 150-51 (2000). A motion for judgment as a matter of law "should be granted only if, viewing the evidence in the light most favorable to the nonmoving party, there is no question of fact for the jury and any verdict other than the one directed would be erroneous under the governing law." *Galena v. Leone*, 638 F.3d 186, 196 (3d Cir. 2011).

Requests to grant a new trial are "almost entirely to the discretion of the district court." *Marcum v. Columbia Gas Transmission, LLC*, 658 F.Supp.3d 252, 265 (E.D. Pa. 2023) (quoting *Blancha v. Raymark Indus.,* 972 F.2d 507, 512 (3d Cir. 1992)). These requests are "disfavored." *Id.* (citing *Williamson v. Consol. Rail Corp.*, 926 F.2d 1344, 1353 (3d Cir. 1991)). Some recognized grounds for a new trial are: "the verdict is against the clear weight of the evidence; damages are excessive; the trial was unfair; and that substantial errors were made in the admission or rejection of evidence of the giving or refusal of instructions." *Northeast Women's Center, Inc. v. McMonagle*, 689 F.Supp. 465, 468 (E.D. Pa. 1988). "A district court may not substitute its own judgment for that of the jury simply because the court might have come to a different conclusion.

*Grace v. Mauser-Werke Gmbh*, 700 F.Supp. 1383, 1387 (E.D. Pa. 1988) (citing *Douglas W. Randall, Inc. v. A.F.A. Protective Systems, Inc.*, 516 F.Supp. 1122, 1124 (E.D. Pa. 1981) (*aff'd mem.* 688 F.2d 820 (3d Cir. 1982)).

## IV. DISCUSSION

Mr. Gai's argument is largely based on the premise that the only allegation against him is that he threatened Mr. Ren. ECF No. 212 at 13. He argues that this single act is not sufficient to establish more than one predicate act, and it has no bearing on bank fraud or wire fraud. *Id.* Mr. Gai even asserts that the jury must have been "confused" when they found him liable for bank fraud and wire fraud. *Id.* Mr. Gai reaches this conclusion by ignoring the wealth of additional evidence submitted to the jury as to Mr. Gai, which is altogether more than sufficient to uphold the jury's verdict. When confronted with evidence related to the jury's findings of wire fraud and bank fraud, Mr. Gai characterizes it as only relating to "immaterial matters" and again claims that the jury was "confused." ECF No. 302 at 2-3. Mr. Gai errs in two respects. First, he does not address the issue of his own credibility; the jury is entitled to make a determination of his credibility and credit his statements accordingly. Second, he discounts the evidence presented against him, failing to draw all inferences in favor of the nonmoving party. Considering the evidence under the appropriate standard, the jury had a substantial basis for arriving at their judgment.

### a. Credibility

In considering the evidence at trial, the court "may not weigh the evidence, determine the credibility of the witnesses, or substitute its version of the facts for the jury's version." *Taha v. Bucks County Pennsylvania*, 408 F.Supp.3d 628, 636 (E.D. Pa. 2019) (citing *Lightning Lube, Inc. v. Witco Corp.*, 4 F.3d 1153, 1166 (3d Cir. 1993)). It is "the jury's vital and exclusive function to

make credibility determinations." *Ralston v. Garabedian*, 2022 WL 19273, at *13 (E.D. Pa. Jan. 3, 2022) (quoting *United States v. Charley*, 189 F.3d 1251, 1266 (10th Cir. 1999)) (internal quotation marks omitted). The jury evidently found Mr. Gai's credibility lacking, and they had ample reason for doing so.

> The jury received instructions on inaccurate witness testimony, including:
>
> if you believe some part of the testimony of [a] witness to be inaccurate, consider whether that inaccuracy casts doubt upon the rest of that same witness' testimony. You should consider whether the inaccuracy is an important matter or a minor detail. You should also consider any possible explanation for the inaccuracy. Did the witness make an honest mistake or simply forget or was there a deliberate attempt to present false testimony? If you were to decide that a witness intentionally lied about a significant fact that may affect the outcome of the case, you may, for that reason, alone, choose to disbelieve the rest of that witness' testimony, but you're not required to do so.

ECF No. 201 at 41-43. Mr. Gai's trial testimony began by contradicting his deposition testimony on numerous points. He contradicted his previous sworn testimony on whether he could read or write English (ECF No. 206 at 78-79), whether he had a partner at his company (*id.* at 79), the length of the time that his partner worked at the company (*id.* at 80), who drafted the contract between G&Y and UIG (*id.* at 82-83), and the time that he started working on the project (*id.* at 92-93). Moreover, Mr. Gai testified in his deposition that the work was finished in June 2019, but he continued submitting monthly invoices on the project until October 2019 (*id.* at 101-104) and submitted invoices for repair work for cabinets that he maintained he installed himself (and thus should not have needed repairs). *Id.* at 111-114.

Mr. Gai attempts to cast these contradictions as "immaterial matters" that have no bearing on fraud. ECF No. 302 at 1-2. Yet Mr. Gai ignores that this continuous series of contradictions bears on his credibility and makes the jury less willing to believe any of his other claims. Mr. Gai's credibility is further weakened since some of the discrepancies that may seem minor on their face

are relevant when considered in the context of the other facts in this case. For example, Plaintiffs submitted evidence that Shin Da had not installed any cabinets on the seventh floor, and that LN Flooring had installed cabinets on that floor after Shin Da was fired. ECF No. 206 at 108. However, G&Y's invoice for the seventh floor indicated that it was performing repairs on that floor – which would have been repairs on LN Flooring's work, rather than Shin Da's. *Id.* at 109. Mr. Gai then backtracked and said that G&Y had installed some cabinets on the seventh floor. *Id.* at 113. Throughout the entire exchange, Mr. Gai repeatedly equivocated and contradicted himself. *Id.* at 108-113. The jury is certainly entitled to view his responses as not just "apparent inconsistencies," ECF No. 302 at 1-2, but untruths that go directly to the heart of whether Mr. Gai actually performed corrective work, or whether he was involved in fabricating invoices to mislead Parke Bank and other entities.

 Mr. Gai attempts to cast his involvement as solely restricted to performing contracting work, and completely isolated from the larger scheme perpetrated by Mr. Wei. Yet his testimony makes this characterization easy for the jury to reject. Mr. Gai concedes that he simply wrote on the invoices whatever Mr. Wei told him to *after* being paid by Mr. Wei, that he wrote a generic description of the work performed without regard to the accuracy, that he miscalculated the tax allegedly paid on every single invoice, and that he was unable to clearly explain what work he did on the seventh floor. Mr. Gai attempts to argue that "the manner and timing of his work and submission of invoices was not a particular concern of his." ECF No. 302 at 2. This is hardly a defense amid circumstantial evidence, and a finding at trial, that Mr. Gai was part of a long-running fraudulent scheme.

 With an adverse credibility determination against Mr. Gai, the jury was entitled to disbelieve his answers regarding the remainder of the suspicious circumstances surrounding his

work. When he claimed he was only a contractor focused on his work and had no awareness of the broader scheme, the jury was eminently reasonable in concluding that he was being dishonest.

### b. Other Predicate Acts

With a firm basis for disbelieving Mr. Gai's testimony, the jury could logically conclude that he was involved in fabricating invoices in a manner sufficient to constitute the predicate acts of wire fraud and bank fraud. Mr. Gai's most direct involvement in fabricating invoices was his testimony surrounding the creation of six invoices created monthly from May to October 2019 that purportedly involved fixing Shin Da's deficient work. Mr. Gai testified that Mr. Wei would pay him *before* he submitted an invoice, and then Mr. Gai would simply input that dollar amount onto the invoice, and insert descriptions that were not necessarily related to specific work that Mr. Gai had performed. *See* ECF No. 206 at 98 ("Q. [S]o the description second floor minor repair and caulking isn't actually related to specific work that it's being invoiced for?" A. Yes."). Mr. Gai asserted that this was a "fixed-price" contract, so the invoices were irrelevant. However, he testified that the amount on each invoice was "the total of labor, material, and equipment used." ECF No. 206 at 97. And because the invoices were only issued *after* Mr. Gai was paid by Mr. Wei, there would be no way for Mr. Wei (or Mr. Gai) to know the exact costs if he paid Mr. Gai before the invoice was issued. *Id.* at 97-98. Again, this is sufficient for the jury to conclude that Mr. Gai was dishonest about the invoices.

The jury also evidently found Mr. Gai's answers regarding other aspects of the invoices to be unconvincing. Mr. Gai testified that his company miscalculated the tax payments on every invoice, resulting in apparent overpayment of tax – although Mr. Gai was equivocal as to whether he actually paid taxes or not. *Id.* at 99-100. Mr. Gai also charged vastly different amounts for the same description of work in his invoices; while he claimed that was because the work itself was

different, his invoices do not reflect that, and the jury is entitled to disbelieve his explanation. *Id.* at 104-105.

Similarly, the video and photos presented to the jury that purportedly show cabinets improperly installed by Shin Da is of dubious probative value. The video was taken on June 26, 2019, five months after Mr. Ren was kicked off the job, and two to four months after Mr. Gai ostensibly began working on the cabinets. ECF No. 206 at 11. Photographs of the ostensibly deficient work were taken in May 2019. ECF *Id.* at 15-16. Moreover, LN Flooring had also worked on installing cabinets after Shin Da was fired and before the photographs and video were taken. *Id.* at 108. On top of that, Mr. Wei testified that employees of UIG and Wei's Properties (both owned by Mr. Wei) helped Shin Da perform the work. ECF No. 205 at 79. The jury reasonably could have concluded that there was no way to determine whether the deficiencies in the videos were a result of work by Shin Da, rather than LN Flooring, G&Y, or UIG. These suspicious circumstances were fairly construed by the jury to be further evidence of Mr. Gai's dishonesty and his awareness and involvement in the scheme.

With this evidence, the jury had a substantial basis to conclude that Mr. Gai committed numerous counts of the predicate acts of wire fraud and bank fraud within a ten-year period, and that those acts were related to one another in order to carry out the scheme.[3]

### c. Continuity

Mr. Gai also objects that the jury could not have found continuity between the scheme and the predicate acts. Continuity under RICO can be found in two forms. Closed-ended continuity can be established by showing that the underlying scheme, along with the accompanying predicate acts took place over a "substantial" period of time. *Tabas*, 47 F.3d at 1292. To qualify as

---

[3] Mr. Gai concedes that the jury had a legally adequate basis to substantiate the predicate act of theft by unlawful taking. *See* ECF No. 212 at 2 n.2.

substantial, the scheme itself must last longer than roughly a year; the duration between predicate acts committed is not as pertinent. *Id.; see also Plater-Zyberk v. Abraham*, 1998 WL 67545 at *9 (E.D. Pa. Feb. 17, 1998) (quoting *Kehr Packages, Inc. v. Fidelcor, Inc.*, 926 F.2d 1406, 1414 (3d Cir. 1991)) (in a case involving mail fraud and wire fraud, "the continuity test requires us to look beyond the mailing and examine the underlying scheme or artifice."). "The Third Circuit has developed a durational requirement of at least twelve months" to satisfy continuity. *Plater-Zyberk*, 1998 WL 67545 at *9; *see also Leonard A. Feinberg, Inc. v. Central Asia Capital Corp., Ltd.*, 974 F.Supp. 822, 849 (E.D. Pa. 1997) (finding 18 months a sufficient period of time to establish continuity); *O'Keefe v. Ace Restaurant Supply, LLC*, 2016 WL 127566, at *4 (E.D. Pa. Jan. 12, 2016) (finding closed-ended continuity adequately pleaded when "the alleged fraud lasted longer than twelve months."). Open-ended continuity can be satisfied "by showing that the predicate acts or offenses are part of an ongoing entity's regular way of doing business." *H.J. Inc. v. Northwestern Bell Telephone Co.*, 492 U.S. 229, 242 (1989).

Since Mr. Gai asserts that the only viable predicate act is his alleged threat against Mr. Ren, Mr. Gai places the maximum timespan for continuity purposes as August 2018 (the date that UIG contracted with Shin Da to do the work) through January 2019 (the date of the alleged threat). However, this timeline ignores that the length of the *scheme* is the relevant factor, not the length between predicate acts (Mr. Gai's proposed timeline also ignores his predicate acts of wire fraud and bank fraud). Plaintiffs submitted evidence showing that the scheme began as early as January 2016 and lasted through 2020. ECF No. 301 at 16-19. This length of time easily surpasses the Third Circuit's 12-month minimum.

The evidence submitted at trial also supports a finding of open-ended continuity. The jury saw a substantial amount of evidence attesting that Mr. Wei had a practice of fabricating invoices

in order to inflate the amount of money loaned to him. Mr. Gai illustrated in his own words that fraud was part and parcel of the way he and Mr. Gai did business. Mr. Gai described the practice of Mr. Wei paying him before receiving the invoices, then filling in the description on the invoices with a generic statement that was not necessarily related to the actual work performed. Mr. Gai plainly stated that this was the "normal way of doing things." ECF No. 206 at 98. At trial, Plaintiffs presented a wealth of evidence as to fraudulent contracts and activities taking place over a period of several years, involving numerous parties and varied components to the scheme. The jury had ample grounds to conclude that had the lawsuit not been successful, Mr. Wei would have continued the scheme ad nauseam, with Mr. Gai as his frequent collaborator.

### d. Wire Fraud

Mr. Gai also asserts that Plaintiffs did not present sufficient evidence of his specific intent to support predicate acts of wire fraud and bank fraud. The Third Circuit has found sufficient evidence of specific intent with regard to wire fraud where a conspirator was instructed to send false invoices and letters regarding meetings that never occurred. *U.S. v. Veksler*, 62 F.3d 544, 552 (3d Cir. 1995). Specific intent can also be found "from a material misstatement of fact made with reckless disregard for the truth." *Sunlight Elec. Contracting Co., Inc., v. Turchi*, 918 F.Supp.2d 392, 402 (E.D. Pa. 2013) (quoting *United States v. Hannigan*, 27 F.3d 890, 892 n.1 (3d Cir. 1994)) (internal quotation marks omitted). Mr. Gai acknowledged that the descriptions in the invoices had no relation to the amounts of money he was paid. *See* ECF No. 206 at 98 ("Q. [S]o the description second floor minor repair and caulking isn't actually related to specific work that it's being invoiced for? A. Yes."). In creating these invoices, the jury concluded that Mr. Gai knowingly wrote false descriptions of work that had no relation to the amount of money he was paid. Along with the other circumstantial evidence of fraudulent activity, such as his miscalculation of the

purported state tax and contradictory testimony about work on the seventh floor, this provides evidence that Mr. Gai had specific intent to fabricate the invoices. This evidence is sufficient to support claims for specific intent of wire fraud and bank fraud.

V.   **CONCLUSION**

Mr. Gai's motion simply weighs the evidence in a different manner than the jury did, emphasizing evidence he finds persuasive, and discounting evidence he does not. That is not a basis to overrule the jury's decision following an extensive trial. Mr. Gai's renewed motion for judgment as a matter of law and his motion for a new trial are **DENIED.**

                                                  **BY THE COURT:**

                                                  /s/ Chad F. Kenney

                                                  _____
                                                  **CHAD F. KENNEY, JUDGE**